IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

AMY VELEZ, PENNI ZELINKOFF,              )
MINEL HIDER TOBERTGA,                    )
MICHELLE WILLIAMS, JENNIFER              )
WAXMAN-RECHT, KAREN LIGGINS,             )
LORI HORTON, HOLLY WATERS,               )
WENDY PINSON, ROBERTA                    )
VONLINTEL, ASHLEY NARMOUR,               )
CATHERINE WHITE, KELLY                   )
CORBETT, SUE EARL, JAMIE                 )
HOLLAND, JOAN DURKIN, SIMONA             )
LOPES, MARYANNE JACOBY,                  )
and MARTA DEYNE,                         )
                                         )        04 Civ. 09194 (GEL)
Individually and on Behalf of Others     )
Similarly Situated,                      )
                                         )
                                         )        MEMORANDUM OF LAW
PLAINTIFFS,                              )        IN SUPPORT OF
                                         )        PLAINTIFFS' MOTION FOR
v.                                       )        CLASS CERTIFICATION
                                         )
NOVARTIS CORPORATION,                    )
NOVARTIS PHARMACEUTICALS                 )
CORPORATION, and THOMAS                  )
EBELING,                                 )
                                         )
DEFENDANTS.                              )
                                         )

## TABLE OF CONTENTS

I.   Introduction.................................................................................................................1

II.  Overview of Claims and Relief Sought .....................................................................1

III. Statement of Facts......................................................................................................4

    A.  The Corporate Structure at Novartis is Centralized and Standardized ................4

    B.  Novartis' Operations Are Governed by a Centralized Personnel Management
        System and Uniform Personal Practices.............................................................5

    C.  Novartis Corporate Culture Is Permeated by Gender Stereotypes That Begin
        With the CEO, Defendant Thomas Ebeling, and Filter Down .............................6

        1.  The Dominance of Males in Management Perpetuates Gender
            Stereotypes...............................................................................................7

        2.  Novartis' Corporate Culture of Gender Discrimination .......................7

        3.  Novartis Admits that Gender Bias is a Problem ...................................8

    D.  Novartis Gives Managers, Who Are Mostly Male, Broad Discretion Regarding
        Assignment of Performance Ratings, Promotion Decisions, and Pay Allocations
        Affecting Representatives...................................................................................9

        1.  Performance Ratings Are Determined by Managers Who Enjoy Broad
            Discretion in Interpreting the Highly Subjective Performance
            Management System..................................................................................9

        2.  Novartis' Forced Distribution Ranking System and Deficient Appeals
            Process Disfavor Women.........................................................................12

        3.  Overwhelming Evidence Demonstrates That Novartis' Subjective
            Performance Management System Adversely Affects Women...........13

        4.  Managers Enjoy Unfettered Discretion in Promotional Decisions......14

         5.  Novartis Affords Managers Sweeping Discretion Regarding Pay
            Decisions...................................................................................................17

        6.  Managerial Discretion Dominates Disciplinary Procedure .................19

        7.  Managerial Discretion Exists With Little Oversight and With Poor
            Complaint Procedures...............................................................................20

    E.  Novartis Discriminates Against Women on the Basis of Pregnancy.................20

    F.  Statistical Measures Demonstrate the Pay, Promotion and Pregnancy
       Discrimination at Novartis..................................................................................22

        1.  Statistical Evidence Shows Promotion Discrimination at Novartis.....22

        2.  Statistical Evidence Demonstrates Discrimination in Pay at Novartis 23

        3.  Statistical Evidence Demonstrates Pregnancy Discrimination ...........24

    G.  Anecdotal Evidence From 87 Declarants Supports the Claims of Gender
       Discrimination at Novartis..................................................................................25

    H.  Novartis Has Had Ample Notice of Systemic Barriers for Women But Has
       Failed to Take Effective Measures to Address and Eliminate Such Barriers .....25

IV. Argument ...................................................................................................................26

    A.  Courts in the Second Circuit and Other Circuits Have Repeatedly Granted Class
       Certification in Title VII Employment Cases Nearly Identical to The Facts
       Presented Here. Plaintiffs' Powerful Case for Certifying a Class of Novartis
       Female Sales Personnel Easily Satisfies the Rule 23 Test Formulated by the

Second Circuit's Recent Decision in <u>In re Initial Public Offering Securities Litigation</u> ("IPO") ...................................................................26
   1. Employment Discrimination Class Actions are Favored by the Courts ....................................................................................................26
   2. Plaintiffs' Suit Represents a Prototypical Example of a Class that Courts Customarily Certify................................................................27
   3. Certifying a Class Here is Completely Consistent with <u>IPO</u> ...........29
   4. Under <u>IPO</u>'s Clarified Standard, Plaintiffs Have Satisfied All the Requirements of Rule 23 ....................................................................32
B. Standards for Class Action Under F.R.C.P. 23 ....................................33
C. The Proposed Class Meets the Requirements of Rule 23(a)................34
   1. The Proposed Class is Ascertainable .................................................34
   2. Plaintiffs Satisfy Rule 23(a)(1)'s Requirement of Numerosity Because the Proposed Class Members Make Joinder Impracticable .................34
   3. Plaintiffs Satisfy 23(a)(2)'s Requirement of Commonality Because The Proposed Class Members Share Common Questions of Law and Fact......................................................................................................35
      a. Plaintiffs and the Class Have Common Claims That Rely on the Same Evidence..............................................................................36
      b. Multiple Common Questions of Fact and Law Are Present in This Case..........................................................................................37
      c. Common Issues of Law Arise From Plaintiffs' Reliance on Both Disparate Impact and Disparate Treatment Theories of Gender Discrimination.........................................................................38
         i. Disparate Treatment..................................................38
         ii. Disparate Impact.......................................................39
   4. Plaintiffs Satisfy 23(a)(3)'s Requirement of Typicality Because the Claims of the Named Plaintiffs Are Typical of Those of the Class.....40
      a. Plaintiffs' Pay Claims Are Typical of The Class.................41
      b. Plaintiffs' Promotion Claims Are Typical of The Class.......42
      c. Plaintiffs' Pregnancy Claims Are Typical of The Class.......43
   5. Plaintiffs Satisfy 23(a)(4)'s Requirement of Adequate Representation Because Plaintiffs And Their Counsel Will Sufficiently Protect The Interests of The Class.........................................................................44
D. The Proposed Class Meets The Requirements of Rule 23(b)(2) And Rule 23(b)(3) .................................................................................................45
   1. The Proposed Class Meets The Requirements of Rule 23(b)(2) ........45
   2. This Action Also Meets The Requirements For Certification Under Rule 23(b)(3)......................................................................................49
   3. The Proposed Class May Also Be Certified as a Hybrid Action.........50
V. Conclusion ..................................................................................................51

## TABLE OF AUTHORITIES

**CASES**

Allison v. Citgo Petroleum Corp., 151 F.3d 402 (5th Cir. 1998) .................................................. 48

Amchem Products, Inc., v. Windsor, 521 U.S. 591, 614 (1997) ...................................... 26, 33, 46

Ansoumana v. Gristedes Operating Corp., 201 F.R.D. 81, 86 (S.D.N.Y. 2001) .................... 41, 49

Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 60 (2d Cir. 2000) .................... 44

Barefield v. Chevron U.S.A., Inc., 1987 WL 65054 (N.D. Cal. Sep. 9, 1987) .............................. 28

Beckmann v. CBS, Inc., 192 F.R.D. 608, 615 (D. Minn. 2000) ............................................ 26, 28

Bolanos v. Norwegian Cruise Lines Ltd., 212 F.R.D. 144, 157-58 (S.D.N.Y. 2002) .................. 49

Butler v. Home Depot, 1996 WL 421436 (N.D.Cal. Jan 25, 2006) ............................................ 51

Caridad v. Metro-North Commuter R.R. Co., 191 F.3d 283 (2d Cir. 1999) .......................... 28, 29

Cokely v. New York Convention Center Operating Corp., 2004 WL 1152531 (S.D.N.Y 2004) 46

Consol. Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d Cir. 1995) ............................... 35

DeMarco v. Robertson Stephens, Inc., 228 F.R.D. 468, 470 (S.D.N.Y. 2005) ............................ 30

Dunnigan v. Metropolitan Life Ins. Co., 214 F.R.D. 125, 135 (S.D.N.Y. 2003) ........................ 34

East Texas Motor Freight System, Inc. v. Rodriguez, 431 U.S. 395, 405 (1977) ....................... 26

Gelb v. Am. Tel. & Tel. Co., 150 F.R.D. 76, 78 (1993) .............................................................. 46

General Tel. & Tel. Southwest v. Falcon, 457 U.S. 147, 159 & n.15 (1982) .............................. 27

Griggs v. Duke Power Co., 401 U.S. 424, 432 (1971) ............................................................ 39-40

Hartman v. Duffy, 19 F.3d 1459, 1472 (D.C. Cir. 1994) ........................................................... 32

Hnot v. Willis Group Holding Ltd., 2005 WL 659475 (S.D.N.Y. 2005) 27, 30, 30, 33, 34, 36, 37,
   39, 44, 48

In re Initial Public Offering Litigation, 471 F.3d 24 (2d Cir 2006) ......................... 4, 26, 28-33, 51

In re Livent, Inc. Noteholders Securities Litig., 210 F.R.D. 512, 519 (S.D.N.Y. 2002) .............. 50

In re Methyl Tertiary Butyl Ether Products Liability Litig., 209 F.R.D. 323, 336 (S.D.N.Y. 2002)
   ....................................................................................................................................... 34

In re Monumental Life Ins. Co., 365 F.3d 408, 417 (5th Cir. 2004) ......................................... 51

In re Salomon Analyst Metromedia Litig., 236 F.R.D. 208, 212 (S.D.N.Y. 2006) ..................... 30

In re Visa Check/Mastermoney Antitrust Litig., 192 F.R.D. 68, 88 (E.D.N.Y. 2000), aff'd, 280
   F.3d 124 (2d Cir. 2001) ................................................................................. 29, 33, 47, 49

In re Worldcom, Inc. Sec. Litig., 219 F.R.D. 267, 279 (S.D.N.Y. 2003) .................................... 35

Ingles v. City of New York, 2003 WL 402565 (S.D.N.Y. 2003) ................................................. 41

Int'l Bhd. Of Teamsters v. United States, 431 U.S. 324, 336 (1977) ........................................ 38

Jones v. Ford Motor Credit Co., 2005 WL 743213 (S.D.N.Y. March 31, 2005) ........................ 28

Krueger v. N.Y. Tel. Co., 163 F.R.D. 433, 442 (S.D.N.Y. 1995) ................................................ 41

Latino Officers Ass'n of New York v. The City of New York, 209 F.R.D. 79, 88 (S.D.N.Y. 2002)
   ........................................................................................................................... 35, 36, 48

Lo Re v. Chase Manhattan Corp., 431 F. Supp. 189, 196-197 (S.D.N.Y. 1977) ........................ 41

Maneely v. City of Newburgh, 204 F.R.D. 69, 78 (S.D.N.Y. 2002) .......................................... 50

Marisol A. v. Guiliani, 126 F.3d 372, 376 (2d Cir. 1997) ......................................................... 35, 37

Mathers v. Northshore Mining Co., 217 F.R.D. 474, 487 (D. Minn. 2003) ......... 28, 32, 37, 48, 50

McBean v. City of New York, 228 F.R.D. 487, 491-922 (S.D.N.Y 2005) ....................... 30, 33, 48

McReynolds v. Sodexho Marriott Services, 208 F.R.D. 428 (D. D.C. 2002) ................. 28, 32, 37

Mendez v. Radec Corp., 232 F.R.D. 78, 92 (W.D.N.Y. 2005)........................................ 49
Meyer v. MacMillan Publishing Co., 95 F.R.D. 411, 416-17 (S.D.N.Y. 1982).......................... 45
Morgan v. UPS, 169 F.R.D. 349, 358 (E.D. Mo. 1996) ................................................ 50
Noble v. 93 Univ. Place Corp., 224 F.R.D. 330, 343 (S.D.N.Y. 2004)......................................... 49
Parker v. Time Warner Entm't Co., L.P., 331 F.3d 13, 19-20 (2d 2003)...................................... 48
People United for Children, Inc., v. City of New York, 214 F.R.D. 252, 256 (S.D.N.Y. 2003).. 34
Robinson v. MetroNorth Commuter R.R., 267 F. 3d 147 (2d Cir. 2001), cert. denied, 122 S.Ct.
   1349 (2002)..........................................................................4, 27, 35, 38-40, 44, 46-50
Rossini v. Ogilvy & Mather, 798 F.2d 590, 598 (2d Cir. 1986).................................................. 49
Shipe v. Trinity Indus. 987 F. 2d 311 (5th Cir. 1993) .................................................. 28
Shores v. Publix Super Markets, Inc., 1996 WL 407850 (M.D. Fla. Mar 12, 1996)................... 48
Smith v. Nike Retail Services, Inc., 234 F.R.D. 648 (N.D. Ill. 2006) ........................... 28, 31, 37
Spinner v. City of New York, 2003 WL 23648356, at *4 (E.D.N.Y. October 10, 2003) ........... 41
Staton v. Boeing, 327 F.3d 938 (9th Cir. 2003)........................................................... 28
Szabo v. Bridgeport Machines, Inc., 249 F.3d 672, 677 (7th Cir. 2001).................................. 32
Taylor v. District of Columbia Water & Sewer Auth., 205 F.R.D. 43 (D. D.C. 2002)................ 28
Trief v. Dun & Bradstreet Corp., 144 F.R.D. 193, 198 (S.D.N.Y 1992)...................................... 35
Visa U.S.A., Inc. v. Wal-Mart Stores, Inc., 536 U.S. 917, 153 L. Ed. 2d 201, 122 S. Ct. 2382
   (2002).............................................................................................................. 47
Wagner v. The NurtraSweet Co., 170, F.R.D. 448, 450-51 (N.D. Ill. 1997)............................... 36
Warren v. Xerox Co., 2004 WL 1562884, at *10 (E.D.N.Y. Jan. 26, 2004). 28, 37, 39, 41, 47, 48,
   50, 51
Watson v. Fort Worth Bank of Trust Co., 487 U.S. 977, 990-91 (1988) .............................. 27, 40
Wilfong v. Rent-a-Car, Inc., 2001 WL 1795093 (S.D. Ill. Dec. 27, 2001) ................................. 28
Williams v. Burlington Northern, Inc., 832 F.2d 100, 103 (7th Cir. 1987)................................. 51
Wolkenstein v. Reville, 539 F.Supp. 87, 89 (W.D.N.Y. 1982) .................................................... 35
Wright v. Stern, 2003 WL 21543539 (S.D.N.Y. Jul. 9. 2003) .................................. 28, 39, 41, 50

## FEDERAL RULES

Fed. R. Civ. P. 23 .......................................................................................................... 27
Fed. R. Civ. P. 23(a).................................................................................................... 33
Fed. R. Civ. P. 23(a)(1)............................................................................................ 34, 35
Fed. R. Civ. P. 23(a)(2)............................................................................................ 33, 35
Fed. R. Civ. P. 23(a)(3)................................................................................................ 40
Fed. R. Civ. P. 23(a)(4)................................................................................................ 44
Fed. R. Civ. P. 23(b) .................................................................................................. 33, 45
Fed. R. Civ. P. 23(b)(2).......................................................................................... 27, 46, 48
Fed. R. Civ. P. 23(b)(2), Advisory Committee Notes, 39 F.R.D. 69, 102 (1966) ........................27
Fed. R. Civ. P. 23(b)(3)............................................................................................ 34, 49

## I.    INTRODUCTION

Defendants Novartis Pharmaceuticals Corporation, Novartis Corporation and Global Head of Novartis Pharmaceuticals Thomas Ebeling, (collectively "Novartis"), for at least the past five years, have paid Novartis female employees less than men, promoted female employees at a significantly lower rate than their male counterparts, and discriminated against pregnant women.

Seventeen Plaintiffs (hereafter "Class Representatives" or "Plaintiffs") seek class-wide injunctive relief, equitable relief in the form of back pay and front pay, and compensatory and punitive damages for a class of women defined as follows:

> All women who are currently holding, or have held, a sales-related job position with Novartis during the time period July 15, 2002 through the present, including those who have held positions as Sales Representatives, Sales Consultants, Senior Sales Consultants, Executive Sales Consultants, Sales Associates, Sales Specialists, Senior Sales Specialists, and District Managers I.

## II.    OVERVIEW OF CLAIMS AND RELIEF SOUGHT

During two years of class certification discovery, Plaintiffs have obtained overwhelming documentary, testimonial and statistical evidence that demonstrates Defendants' rampant class-wide discrimination against female sales employees at Novartis.  This evidence, synthesized in these class motion papers from approximately two million pages of documents produced by Defendants and more than 28,000 pages produced by Plaintiffs, as well as the depositions of 11 Novartis corporate designees and 17 class representatives deposed throughout the United States, is corroborated by 87 declarations from Novartis' female employees, which Plaintiffs also submit.  The declarations of these 87 women, who have worked for the company in 31 states, paint a uniform and common picture of gender discrimination engineered by Novartis' management.

Plaintiffs' experts verify the systemic evidence of gender discrimination to which Novartis subjects its female sales employees. Plaintiffs' statistical expert, Dr. Louis Lanier, Ph.D., has concluded in his report (hereinafter "Lanier Report"), and in his supplemental declaration (hereinafter "Lanier Dec."), that women at Novartis experience pay, promotion, and pregnancy discrimination. Plaintiffs' personnel management expert, Dr. David Martin, Ph.D., has concluded in his report (hereinafter "Martin Report) that Novartis' human resource policies breed widespread bias. The evidence—varied, robust, and conclusive—compels the finding of broad-based discrimination and the treatment of this litigation as a class action.

Novartis has discriminated against Plaintiffs and members of their proposed class, because of their gender, in the following ways:

1. Novartis consistently pays females less than males. In fact, male Novartis employees, across all jobs and years during the class period, on average, earned approximately $2,576.16 more annually than female employees. See Lanier Dec. ¶ 9-11 (Ex. 38).

2. Novartis promotes females at a significantly lower rate than males. Proposed class members face a lower probability of promotion from the sales force to management; males are 4.9 times more likely to be promoted to management positions. See Lanier Dec. ¶ 15. This number is statistically significant to 5.7 standard deviations. Id.

3. Novartis discriminates against women who have taken pregnancy leave. Women who take FMLA leave earn an average of $147 less per month (or $1,764 yearly) in the first 12 months after returning from leave, relative to similarly situated female counterparts and relative to their earnings before taking leave. See Lanier Report p. 24 (Ex. 37). This number is statistically significant to 5.2 standard deviations. Id.

4. Women at Novartis systematically receive fewer "3" ratings (the best rating) than their similarly-situated male counterparts in the subjective portion of the performance evaluation. See Lanier Report p. 22; Lanier Dec. ¶ 17.

5. Novartis has failed to respond to gender inequalities or complaints of discrimination and tolerates a system marked by gender bias, widespread managerial discretion, and a flawed complaint procedure. See Martin Report pp. 6; 9-10; 13 (Ex. 36).

The 17 class representatives seek to eliminate the discrimination enumerated above and to obtain injunctive and other forms of relief for past discrimination.[1] These women seek, *inter alia*, (1) a declaratory judgment that Novartis' employment policies, practices, and/or procedures challenged herein are illegal and violate Title VII; and (2) a permanent injunction enjoining Novartis from engaging in any further unlawful practices, policies, customs, usages and gender discrimination as set forth in the class complaint (i.e. the operative Fourth Amended Complaint).

As part of the injunctive relief, Plaintiffs request an Order (1) requiring Novartis to initiate and implement programs that will provide equal employment opportunities for females and will remedy the effects of Novartis' past discrimination; (2) establishing a task force on equality and fairness at Novartis; (3) placing or restoring the Class Representatives and the class members into those jobs that they would now be occupying but for Novartis' discriminatory policies, practices, and/or procedures; and (4) directing Novartis to adjust the wage rates and benefits for the Class Representatives and class members to the level that they would be enjoying but for the Defendants' discriminatory policies, practices and/or procedures. See Fourth Amended Class Action Complaint at 110, Dkt. No. 56 (Filed March 13, 2006).

---

[1] Two named Plaintiffs, Ashley Narmour and Sue Earl, do not serve as class representatives and proceed individually in this action.

3

The class-wide nature of Plaintiffs' injunctive, equitable and monetary claims, which present common questions of law and fact, meet all the requirements of Rules 23(a), (b)(2) and (b)(3) for class certification under Robinson v. MetroNorth Commuter R.R., 267 F.3d 147 (2d Cir. 2001), cert. denied, 122 S.Ct. 1349 (2002) and In Re Initial Public Offering Litigation, 471 F.3d 24 (2d Cir. 2006), *motion for en banc hearing pending*, which control here.  Accordingly, the Court should certify a Rule 23 (b)(2) or, alternatively, a Rule 23(b)(3) class.

## III.    STATEMENT OF FACTS

### A.    The Corporate Structure at Novartis is Centralized and Standardized.

Novartis has a sales force of approximately 6,000 employees who operate in all 50 states throughout the United States.  See Judy O'Hagan, Head of Human Resources for General Medicine, Dep. 46; 83-84 (Ex. 1).  Novartis' East Hanover Headquarters serves as the central hub for the Company's standardized corporate structure, id. at 156-57, which consists of various organizational units, ranging from territories to national field forces.[2]  The territory, the smallest unit, is the area where a sales representative has accountability for calling on doctors.  Id. at 74. Districts comprise approximately 10 to 12 territories, and approximately 10 to 12 districts create a region.  Id. at 74-75.    The three national field forces, also known as divisions, are mass markets, select (or institutional) markets, and specialty markets, and each field force encompasses eight regions.  Id. at 75; 46-48.  The mass market field force calls on primary care physicians;  the specialty field force calls on specialty physicians, such as neurologists, cardiologists, and oncologists; and the select market field force calls on institutional and long-

---

[2] As has been briefed in the papers regarding the relationship between the corporate defendants, Novartis Corporation owns one hundred percent of Novartis Finances, which in turn owns one hundred percent of Novartis Pharmaceuticals Corporation. See Wayne Merkelson, Novartis Corporation's Associate General Counsel, Dep. September 27, 2005, p. 70, 2-6 (Ex. 26).  Novartis Corporation, *inter alia*, controls Novartis Pharmaceuticals' budget and capital requirements, finances Novartis Pharmaceuticals, and shares HR functions with Novartis Pharmaceuticals. Id. at 212-13.

term care facilities.  Id. at 46-48.  In mass markets, individual representatives report to district managers, who report to regional directors, who report to the sales vice president of one of the three divisions.  Id. at 113-14.  In select markets and specialty markets, parallel hierarchical systems exist.  Id.

Further subdivisions exist within the sales representative positions.  There are four levels of sales employees within mass markets: Sales Representatives, Sales Consultants, Senior Sales Consultants, and Executive Sales Consultants.  See O'Hagan Dep. 85-86.  Likewise, there are three levels of managers: District Manager I, District Manager II, and Senior District Manager, all of whom are responsible for hiring, coaching, leading, and developing a team's sales representatives.  Id. at 85; 108-109.  Similar rungs in the promotional ladder exist with respect to select markets and specialty markets; however, specialty markets contain additional advancement opportunities.  Id. at 87-88; 109-12.

A Novartis sales employee who advances past the managerial level will inevitably return to headquarters.  See Dominic DiCindio, Regional Manager, Dep. 223 (Ex. 4).  For instance, all candidates for sales positions beyond the manager level must enter the Leadership Development Program, which requires a 12 to 18 month rotation in East Hanover.  Id. at 222-24.  Thus, while territories span across the country, the chain of command leads to East Hanover, New Jersey, the central hub of the Novartis organization.  See O'Hagan Dep. 156-57; 57; 46.

**B.**     **Novartis' Operations Are Governed by a Centralized Personnel Management System and Uniform Personnel Practices.**

Novartis' standardized personnel management system and practices are generated in the Company's East Hanover headquarters.  See O'Hagan Dep. 158-59.  Nine departments, including sales, legal, and HR, operate out of the East Hanover office and draft compensation, promotion (career leveling), and human resource policies.  Id.  In order to ensure their

5

standardized implementation, Novartis disseminates such policies throughout the organization with training, managerial instruction, and web-based programs. Id. at 120-23.

All new Novartis sales representatives receive identical formal training regardless of their location. See O'Hagan Dep. 116. After a set period of time for at-home study, new hires attend workshops in East Hanover that train in product knowledge and selling skills. Id. at 116-17.

Training for managers consists of a series of workshops, the foundation of which is a two-week program covering coaching, performance reviews, and compensation, and includes HR instruction, such as hiring guidelines and the Company's stated commitment to Equal Employment Opportunity. See O'Hagan Dep. 121-23. A Novartis-wide computer system that provides and tracks online courses also offers standardized training in EEO and discrimination matters. Id. at 124-25.

In short, wherever they work, and in whatever job, all Novartis field force employees are governed by the same personnel policies and practices, which are conveyed in the same manner throughout the organization.

## C.    Novartis' Corporate Culture Is Permeated by Gender Stereotypes That Begin With the Global Head of Novartis Pharmaceuticals, Defendant Thomas Ebeling, And Filter Down.

Novartis' overwhelmingly male upper management perpetuates a corporate culture characterized by gender bias. Viewing maternity leave as a "vacation" and marriage as a meal ticket, Novartis managers routinely assume that women are not serious about their careers and are hostile to female employees who are pregnant or become engaged. See e.g., Noonan Dec. ¶ 11 (Ex. 27); Tselikis Dec. ¶ 20 (Ex. 30). In addition, male managers often objectify female employees, inappropriately commenting on their physical appearance. See e.g., Corbett Dep. 111 (Ex. 9). In short, men at Novartis have formed a "boys' club," a fraternity-like community

in which male employees take care of each other at the expense of women. See e.g. Wilmesher
Dec. ¶14 (Ex. 27); Benbow Dec. ¶ 6 (Ex. 29).

### 1. The Dominance of Males in Management Perpetuates Gender Stereotypes.

Male dominance in Novartis management is both evidence of and explanation for the
Company's culture of gender bias. In mass markets, women constitute 52.1 percent of lower
ranking Sales Representatives but only 24.2 percent of Executive Sales Consultants. See Lanier
Report, Table 4 (Ex. 41). Select markets and specialty sales demonstrate the same disparity. In
select markets, 51.6 percent of entry level Sales Consultants are women, while 41.2 percent of
Executive Sales Consultants are women. Id. Likewise, in specialty sales, 56.3 percent of entry
level Sales Representatives are women, while only 28.5 percent of Senior Sales Specialists are
women. Id. Because males typically hold the positions of power at Novartis, gender bias more
easily infiltrates the culture.

### 2. Novartis' Corporate Culture of Gender Discrimination.

From corporate executives to District Managers, gender discrimination pervades
Novartis' management. For example, while accompanying Plaintiff Marta Deyne of New Jersey
on sales calls in 2003, Thomas Ebeling, Global Head of Novartis Pharmaceuticals, commented
that the women in the Company's promotional literature were unattractive and that the Novartis
brand team could have "done better." Deyne Dec. ¶ 14 (Ex. 42). Such objectification of women
explains why female employees at Novartis struggle for equality.

District Managers also harbor gender bias and hostility. Declarant Jennifer Ryan Tselikis
from Nevada describes how her male manager, Sam Fusco, explained his disinclination to hire
young females: "First comes love, then comes marriage, then comes flex time and a baby
carriage." Tselikis Dec. ¶ 13. Not unexpectedly, when Ms. Tselikis married, Mr. Fusco

commented, "I guess Ryan isn't going to be with us much longer now that she's hit the lottery." Id. at ¶ 20. Declarant Tracy Fulton, who worked for Novartis in Maryland, D.C., and Virginia, describes another example of Novartis' inequitable culture: District Manager Brain Aiello sometimes asked his female employees what "wife" stands for, saying "'w' stands for washing, 'i' stands for ironing, 'f,' you know what that stands for." Fulton Dec. ¶ 20 (Ex. 33).

Female employees routinely complain of Novartis' culture of gender bias. Plaintiff Michelle Williams of Illinois describes Novartis' culture as "a standard by which the company operates." Williams Dep. 201 (Ex. 24). Numerous other female employees have protested the "old boys club network" at Novartis. See e.g. Wilmesher Dec. ¶14; Benbow Dec. ¶ 6.

### 3. Novartis Admits That Gender Bias is a Problem.

Novartis' culture of gender bias proves so pervasive that the Company's top managers have identified it as a problem. Global Head of Novartis Pharmaceuticals Ebeling acknowledged the diversity imbalance at Novartis in 2003. On his Novartis intranet website, "Ask Ebeling," the following exchange occurred on December 17, 2003:

> Question: Diversity seems to be too often talked about but too infrequently practiced. Where are the women in senior management at this company?
>
> Ebeling: We simply don't have as many women or minorities in high levels of management as we could or should. . . . Thanks for telling it like it is on this topic. . . .

VEL 011234 (Ex. 40).

Three years later, in 2006, Novartis' Vice President of Sales Operations, Frank Arena, told Andrea Waterhouse, Category Manager for Strategic Sourcing, that Novartis still needed to promote more women into sales management positions because there were not enough women in those positions at the Company. Waterhouse Dec. ¶ 14 (Ex. 27). Even Novartis' Chief Legal

Counsel, Dorothy Watson, in describing the reticence of Novartis women to help each other through their uphill battle, said that women at Novartis work in a "fear-based culture." Id. at ¶ 9.

Likewise, Novartis' own surveys, highlighted in the "Women in Leadership" forum, demonstrate Novartis' awareness of under-representation of women in management positions. The surveys reveal that there are approximately three times as many male District Managers I, four times as many male Senior District Managers and roughly nine times as many male Senior Area Sales Managers. See Perkins Dep. 63-64 (Ex. 6). Other "Women in Leadership" literature similarly describe the precipitous drop of women in upper management: less than 25 percent of female representatives become front line managers even though 53 percent of Novartis' workforce is comprised of women. Id. at 95.

**D.    Novartis Gives Managers, Who Are Mostly Male, Broad Discretion Regarding Assignment of Performance Ratings, Promotion Decisions, and Pay Allocations Affecting Representatives.**

The inherent subjectivity in Novartis' pay, promotion, and performance rating systems allows managers to act upon the gender bias that they harbor against women. See Martin Report p. 6. Thus, biased managers exercise their broad discretion in a manner that ensures women receive less money, fewer promotions, more disciplinary actions, and worse performance ratings than men. See Id.; Lanier Report pp. 24-25. In short, gender bias fuels managerial decisions that disfavor women, and the Novartis personnel management system allows for such decisions to remain unchecked. See Martin Report pp. 6; 10; 13.

**1.    Performance Ratings Are Determined by Managers Who Enjoy Broad Discretion in Interpreting the Highly Subjective Performance Management System. The Ratings, in Turn, Affect Promotions And Pay.**

As a company policy, Novartis delegates to its sales managers, who are mostly male, sweeping powers, including the ability to make unilateral personnel decisions. Perhaps most

significantly, managers complete performance evaluations that affect promotional opportunities and pay allocations. See O'Hagan Dep. 142-43; (Day 2) 375-76 (Ex. 2).

Evaluations for sales employees consist of an objective and subjective portion, each of which comprises 50 percent of the total rating and is assigned a numeric value between 1 and 3. See O'Hagan Dep. 166; 179-80. A rating of 1 indicates the employee partially met expectations; a rating of 2 indicates that the employee fully met expectations; and a rating of a 3 indicates that the employee's performance exceeded expectations. See Martin Report p. 3.

Eighty percent of the objective evaluation is based on the employee's incentive rating, a nationally-published figure tied to a territory's prescription trends, See O'Hagan Dep. 168-70, while 20 percent is based on a qualitative analysis of key performance indicators. Id. at 168. Thus, 60 percent of an employee's overall rating is based on subjective information. See Martin Report p. 6.

Subjectivity permeates the ratings that employees receive on their performance evaluations. As an initial matter, the subjective portion of the evaluation consists of a critique of various "competencies," also known as "values and behaviors." See O'Hagan Dep. 180. Among the "competencies" are: leadership skills, territory management, communication, presentation skills, results driven, initiatives, sales results, mutual respect, and candor. See DiCindio Dep. 16-17. Though these competencies comprise fully one-half of sales employees' evaluations and affect pay, promotion, and disciplinary decisions, (see Martin Report pp. 3-5), there are no clear guidelines as to how they are to be assessed. Id. at 5-6.

In fact, high-ranking Novartis employees cannot even agree as to the type and number of competencies. The Head of HR for General Medicines, Judy O'Hagan, opines that there are "seven or eight or nine competencies," O'Hagan Dep. 180; Regional Manager DiCindio

contends there are 14 to 21 core competencies, "depending on how you look at the different competencies," DiCindio Dep. 16-17; and Global Head of Novartis Pharmaceuticals Ebeling asserts that there are approximately seven values and behaviors. See Ebeling Dep. 245 (Ex. 8).

Novartis' evaluation process is so subjective that even the Head of Human Resources for General Medicine, Ms. O'Hagan, cannot articulate the behavior that would merit a 1, 2, or 3 rating for each competency. See generally O'Hagan Dep. 309-318. For example, in the "Innovative and Creative" competency, a sales representative who "[c]omes up with a lot of new and unique ideas," "[c]hallenges 'status quo,'" does not "settle for the first idea," and "synthesizes odd combinations," could receive a 2 or 3 rating. O'Hagan Dep. 310-11. A representative who possesses functional and technical knowledge as well as the skills necessary to successfully perform her role effectively could receive a 1 or 2 rating in the "Competent" category. Id. at 311-12. In the "Leadership" competency, a sales representative who "[a]ligns and energizes associates behind common objectives," "[c]hampions the Novartis Values and Behaviors," and "[r]ewards/encourages the right behaviors and corrects others" could generate a 3 or a 2. Id. at 312-13.

Similarly, in the "Customer/Quality Focus" competency, a representative who "[a]ssigns highest priority to customer satisfaction," "[l]istens to [the] customer," and "[e]stablishes effective relationships," would meet Novartis' "acceptable level" of expectations. O'Hagan Dep. 309-10. However, Ms. O'Hagan does not know whether anything below that level would be unacceptable. Id.

Ms. O'Hagan's uncertainty regarding the qualities required to achieve a 1, 2 or 3 rating extends beyond the examples listed above to the other competency categories. See O'Hagan Dep. 314-18. This ambiguity flows down the chain of command to the managers below Ms.

11

O'Hagan. For instance, Regional Manager DiCindio attests that sales representatives are not necessarily trained in recognizing core competencies. See DiCindio Dep. 17-18. Further, raters receive no guidance concerning how to derive a comprehensive rating from the individual competencies, which renders the performance management system "highly manipulable." See Martin Report p. 6.

As Dr. David Martin attests, the performance rating system at Novartis "invit[es] rater preferences and bias." Martin Report p. 2. However, rather than attempting to improve the accuracy of the evaluations by, for instance, relying on physician surveys for particular skill assessments, Novartis ratifies unnecessary subjectivity and decides that "we'd rather rely on our managers' judgment." O'Hagan Dep. 185-86.

A manager who observes an employee two or three times a year possesses a different foundation for evaluating her than one who observes her seven or eight times a year. See DiCindio Dep. 98. Yet, there are no guidelines regarding how many times a manager must "ride-along" with representatives on sales calls or the amount of feedback required in the form of a Business Development Report ("BDR"). Id. at 24-26; 34-35; 79. Some employees may have two or three BDRs on file, others may have seven, eight, or up to 16, and others may have none at all. Id.

### 2. Novartis' Forced Distribution Ranking System and Deficient Appeals Process Disfavor Women.

A *de facto* forced distribution curve at Novartis further skews the accuracy of employee ratings. Ms. O'Hagan attests that there is a forced distribution system in place at Novartis, admitting that 10 to 15 percent of employee evaluations should include poor performance ratings. See O'Hagan Dep. (Day 2) 360-63; 366-67. According to Mr. DiCindio, if a manager's evaluations fall even 20 percent outside of the distribution guidelines, that manager would "start

getting individuals within HR wanting explanations." DiCindio Dep. 173-74. Ms. O'Hagan similarly testifies that she would tell a rater who disregarded distribution guidelines that he was not doing his job as a leader. See O'Hagan Dep. (Day 2) 365. Because the natural distribution of ratings rarely conforms to a rigid structure, a forced distribution system such as that at Novartis encourages inaccurate performance evaluations that pose as a "tragic substitute for real performance evaluation." Martin Report pp. 2; see generally 7-8.

The process of appealing a performance rating exacerbates the subjectivity inherent in Novartis' evaluation system. Novartis offers no formal appeals process; an employee may only informally go "up the chain of command" or approach HR. O'Hagan Dep. 204-05; see also 216-17. However, HR representatives have no actual authority to change a rating; they serve only as facilitators between the employee and the manager. See e.g., O'Hagan Dep. 218-19.

### 3. Overwhelming Evidence Demonstrates That Novartis' Subjective Performance Management System Adversely Affects Women.

The discretion allowed in the Novartis rating system is used to discriminate against women, and this discrimination is demonstrated by both anecdotal and statistical evidence. For example, Plaintiff Marta Deyne's district manager downgraded her performance rating, attributing Ms. Deyne's sales success to her male counterpart. See Deyne Dep. 56-58 (Ex. 10). Although male sales representatives Joey Colonnello and Perry Bogniani had lower sales numbers than Plaintiff Kelly Corbett in 2004, Regional Director Dan Duhart gave both higher objective rankings than Ms. Corbett on their 2004 year-end reviews. See Corbett Dep. 108-111; 116; 123. Because of this biased review, Ms. Corbett received no stock options or raise. Id. at 109; 129.

Plaintiffs attach hereto 11 declarations that support their claims of biased performance ratings, and these declarations are buttressed by statistical analysis.  See generally Chart of Declarations (Ex. 35) and Exhibits 27-33.

Controlling for the effects of tenure and experience on performance ratings, statistical expert Dr. Louis Lanier concluded that male employees have a 6.2 percent greater probability of receiving a 3 than their similarly-situated female counterparts, which is statistically significant to 2.0 standard deviations.  See Lanier Dec. ¶ 16-17.  Such a disparity between the ratings is not only is unfair, but has a devastating effect on female employees' promotions, pay, and discipline.  See O'Hagan Dep. 142-43; (Day 2) 375-76; Martin Report pp. 3-4.

### 4.    Managers Enjoy Unfettered Discretion in Promotional Decisions.

The subjectivity inherent in Novartis' evaluation system, coupled with unchecked managerial discretion in promotional decisions, leads to unfairness in the promotional process.  See Martin Report pp. 3; 5; 6-11.  An employee is eligible for career promotions and "leveling" advancements when he or she demonstrates the required competencies and sales results.  See DiCindio Dep. 210.  Because one's competencies are assessed by managers according to the subjective criteria outlined above, the promotion process also lends itself to bias.  See Martin Report pp. 5-6.  Managers, who are wholly responsible for deciding whether an employee will be promoted, may inhibit the promotion process for even those employees who have demonstrated solid competencies.  See DiCindio Dep. 214.

The process for entry into management positions is particularly rife with bias and is almost entirely dependent upon managerial discretion.  See Martin Report p. 11.  Selection of employees for promotion into management is determined by performance rating, initiative, and

14

communication of interest to a manager, though these criteria are not numerically weighted. See DiCindio Dep. 188-89.

A sales representative interested in becoming a manager must be accepted for participation in a training program known as the Management Development Program ("MDP"). See O'Hagan Dep. 93-94; DiCindio Dep. 193. The process begins when a sales representative with at least a 2-2 rating expresses interest to her manager. See DiCindio Dep. 190-91. At this initial stage, a manager has the ability to exert an immediate roadblock simply by determining that the individual does not have the "competencies to grow into a management development position." Id. at 206. In fact, a district manager has the discretion to reject even an individual with a 3-3 rating (the highest rating) who is interested in MDP. Id. Indeed, the "subjective judgments of the members of the chain of command play a dominant role in an individual's admission and completion of this [MDP] program." Martin Report p. 11.

Managers may further utilize discretion at later stages of the MDP process. For example, a manager may deny a representative the opportunities necessary to fulfill checklist requirements necessary to enter MDP. See e.g., Deyne Dep. 32-34. Even after a candidate has entered the first stage of MDP, a manager can still refuse to place that candidate in the second class, MDP2. See e.g., Williams Dep. 129-30; 136-40; 156-57; 163; 185; 192-96; 211-14.

Numerous class representatives have complained of managers who have impeded their opportunities for advancement and entry into the MDP process. For example:

- During a realignment in 2004, Plaintiff Jennifer Recht interviewed for one of 11 newly opened senior ophthalmology specialty promotions. See Recht Dep. 213-14; 230 (Ex. 18). Though Ms. Recht had the most ophthalmology experience and years selling Visudyne, along with an excellent track record and good reviews, she was denied the promotion. Id. at 232-33. Eight out of the 11 promotions in that instance went to men. Id. at 243-44.

15

- Plaintiff Michelle Williams completed the first of three parts of the MDP process and even served as an interim district manager for two months in Illinois. See Williams Dep. 125. However, Ms. Williams was continually denied entry to MDP2, despite her qualifications and continual requests for enrollment throughout 2003 and 2004. Id. at 129-30; 136-40; 156-57; 163; 185; 192-96; 211-14. Eventually, after appearing on "World News Tonight," where she described the discrimination she experienced at Novartis, Ms. Williams was admitted into the MDP2. Id. at 58-59.

- Plaintiff Simona Lopes of New York was denied a specialty sales position in 2002 because she did not have two years tenure at Novartis. See Lopes Dep. 123-26 (Ex. 16). However, Tim Waters, Ms. Lopes' counterpart who also did not have two years tenure, received the promotion and told her they made an exception for him. Id. A year later, Ms. Lopes, who had three years experience working with Lotrel and Diovan and strong performance numbers, was passed over for a cardiovascular promotional position in favor of a male who had no experience at Novartis and had never worked in Manhattan or sold the relevant products. Id. at 227-31.

- When Plaintiff Karen Liggins told hiring manager Perry Sternberg that she was interested in a vacant District Manager position, Mr. Sternberg said he was looking for candidates who were willing to relocate to Chicago. See Liggins Dep. 98-100 (Ex. 15). Because Ms. Liggins was unable to relocate from St. Louis at that time, her male counterpart, Larry Karner, was instead selected for the promotion. Id. However, upon accepting the position, Mr. Karner was not required to relocate from his home in Minneapolis. Id.

- When Plaintiff Marta Deyne of New Jersey expressed her interest in MDP, her manager informed her that "being a manager was a difficult job and particularly for a woman, when you have other responsibilities at home that you have to manage." Deyne Dep. 45.

- Plaintiff Minel Tobertga's manager in California told her she would not be considered for the MDP because of her performance. See Tobertga Dep. 149-50. However, Ms. Tobertga's male counterpart, George Lopez, had similar performance and was selected to participate in the MDP. Id. at 149-50; 128 (Ex. 19).

- Plaintiff Jamie Holland of Maryland was admitted to the Management Development Program, but later was abruptly withdrawn from the program on the premise that her numbers were too low. See Holland Dep. 93-96 (Ex. 12). However, Ms. Holland's male counterparts, whose numbers were equal to or lower than hers, were permitted to remain in the MDP. Id.

- When Plaintiff Penni Zelinkoff inquired about the MDP, her manager informed her that unless she ranked in the top 35 percent of Novartis nationwide, she would not be considered for a promotion. See Zelinkoff Dep. 211-12; 100-01 (Ex. 25). However, several male employees, including Sales Representatives Steve Wright and Tom Emerson, were not in the top 35 percent but still received promotions. Id.

- When Plaintiff Lori Horton asked her male manager Mike Cunneen for a recommendation for an oncology sales representative position, he refused, claiming it was against company policy. See Dep. Horton 59 (Ex. 13). Yet he recommended and coached Ms. Horton's less qualified male counterpart, Russell Emerson, for the position, which Mr. Emerson ultimately received. Id. at 66.

- Plaintiff Catherine White's manager refused to support her interest in management training, though she had received an International Sales Award for sales numbers in the top .5 percent of all representatives in the U.S., and instead encouraged and pressured other male sales representatives, who were less qualified and who had not even expressed an interest in management training, to apply. See White Dep. 13-14; 36-37 (Ex. 23).

The subjectivity of Novartis' promotion process, and its resulting discriminatory effect on female employees, is underscored by 36 declarations. See generally Chart of Declarations (Ex. 35) and Exhibits 27-33. Each of these declarants has attested to the fact that Novartis managers systematically promote males who are less qualified than their female counterparts.

### 5.    Novartis Affords Managers Sweeping Discretion Regarding Pay Decisions.

Given the subjectivity inherent in the performance evaluation system, and because merit increases, bonuses and eligibility for Company stocks are tied to ratings, Novartis managers wield extensive discretion over pay decisions. See Anhalt Dep. 24 (Ex. 7). As was noted by Ms. O'Hagan, "[t]he higher the rating, the higher the pay raise." O'Hagan Dep. 338. Likewise, only those sales personnel with ratings of "exceptional" and "superior" (ratings of at least a 2-2 or higher) receive Company stock options. See Anhalt Dep. 32-33.

Employees' merit bonuses are also subject to managerial discretion, which is based on a range determined by performance, an individual's competencies and team contribution. See O'Hagan Dep. (Day 2) 375-77; DiCindio Dep. 182; Anhalt Dep. 27; 35. Yet, there are no guidelines to help a manager determine where in the range a merit increase should fall. See DiCindio Dep. 185-86. In fact, some managers consider the act of determining a bonus to be "a

skill." DiCindio Dep. 186.  Because managers receive fixed amounts of money to distribute to their teams in the form of bonuses, (see DiCindio Dep. 187; Anhalt Dep. 35-36), if one person receives the maximum bonus, another person receives a lesser amount.  Managers can literally take from one representative to give to another.  Plaintiff Jamie Holland asserts that "there's the ability to provide additional compensation to a rep on a subjective basis that could potentially move them up in a ranking and be of benefit to the male" and "the money's going to a male." Holland Dep. 200-01.

The pay disparity between male and female sales personnel is reflected by both anecdotal and statistical evidence.  Plaintiffs routinely received less pay than equally or less qualified and experienced male counterparts:

- In 2003, Plaintiff Maryanne Jacoby's manager denied her a merit increase, while granting one to her male counterpart with similar sales numbers. See Jacoby Dep. 223 (Ex. 14).

- Plaintiff Deyne received a smaller raise than men in her division who had lower sales numbers than she. See Deyne Dep. 94-95.

- Plaintiff Lopes received a lower salary than less qualified male employees.  See Lopes Dec. ¶ 20 (Ex. 34).  For example, a male colleague, Syed Tehsin, who had been working in pharmaceutical sales for approximately two years earned $2,300 more than she did, though she had worked for Novartis for five years. Id.

- Along with two other female sales representatives, Plaintiff Williams was denied the opportunity to negotiate her salary, while a male transitioning during the same period negotiated his compensations. See Williams Dep. 69-76.

- Plaintiff Recht earned less than almost all of her male counterparts, including Tim Rogers, Brian Tully, Mike Smith, Greg Crossland, and Jeff Meloche, by as much as $30,000. See Recht Dep. 300-301.

- Plaintiff Liggins' December 2002 bonus was $200 less than many of her coworkers, most of whom were male. See Liggins Dep. 78, 206. Further, Ms. Liggins knew of several male representatives, but no women, who received retention bonuses to stay with Novartis. Id.

- Plaintiff Wendy Pinson received approximately half a percent increase in pay in 2004, while her male coworkers received a much greater salary increase, despite performing at the same or lower numbers. See Pinson Dep. 109 (Ex. 17).

- Plaintiff Roberta VonLintel's husband, who happened to be her direct counterpart, earned a salary of approximately $14,932 more than she did at one point in early 2002. See VonLintel Dep. 200-02 (Ex. 21). Even after she received a promotion, her husband still earned approximately $8,000 more than she did. Id. at 201

As set forth below, statistical evidence also demonstrates that that these types of gender-based disparities are systematically imposed at all levels of Novartis's corporate structure.

### 6.    Managerial Discretion Dominates Disciplinary Procedures.

The managerial discretion inherent in Novartis' disciplinary process provides further opportunity for discriminatory treatment of female employees and is particularly evident in implementation of the Performance Improvement Plan ("PIP"). While Novartis describes this process as a formal and written set of guidelines designed to help employees who are not performing to standard, (see O'Hagan Dep. 424 (Ex. 3)), there are no set regulations regarding the use or duration of a PIP. Id. at 426-430. In fact, Ms. O'Hagan admits that an employee can be placed on a PIP "even if last year's rating was a 2-2." Id. at 426. The duration of the PIP depends on whether and when, in the judgment of management and HR, the employee no longer possesses certain deficiencies. Id. at 429-30. Yet, there are "no hard and fast rules" for determining which deficiencies take more time than others to improve. Id. at 431. Additionally, managers reserve complete discretion in deciding whether to put an employee on a Territory Coaching Plan ("TCP"), which is a "precursor" to a PIP. Id. at 435-36; Durkin Dep. 119.

The use of PIPs enables managers to create a negative paper trail for employees and justify punishment, including termination. Plaintiff Amy Velez of Maryland was placed on a PIP five days before she planned to take six months of disability leave, See Velez Dep. 58 (Day 2) (Ex. 20), and Plaintiff Joan Durkin of Illinois was placed on a TCP soon after returning from

19

maternity leave. See Durkin Dep. 119; 175-76 (Ex. 11).    Plaintiff Durkin's coworker, Meg

Angevine, was also placed on a PIP soon after returning from family leave.    Id. at 175-76.

Plaintiffs provide herein 15 declarations from female employees who describe the discriminatory

manner in which Novartis managers have used PIPs and TCPs.    See generally Chart of

Declarations (Ex. 35) and Exhibits 27-33.

> ### 7.    Managerial Discretion Exists With Little Oversight and With Poor Complaint Procedures.

Novartis managers enjoy sweeping discretion regarding pay, promotions, and discipline

decisions.    While guidelines exist regarding performance ratings and pay ranges, there is no

system to review an individual employee's performance or to assess her pay.    See Anhalt Dep.

68-71. The fact that 50 employees "appealed" their performance ratings in a single year, (see

O'Hagan Dep. 206), underscores the significant flaws inherent in Novartis' performance

management system and the need for further monitoring. See Martin Report p. 10.

Novartis' complaint procedure for issues such as gender and pregnancy discrimination is

marred by uncertain and unarticulated protocol.  Only within the last year has Novartis created a

written document outlining the protocol for investigating employee complaints. See O'Hagan

Dep. (Day 3) 385-86.   Yet, the Head of Human Resources for General Medicines cannot specify

the extent to which this document is distributed amongst Novartis employees. Id. at 387.  Nor

can she point to any system within HR that can be used to track gender discrimination

complaints.  Id. at 419-20.  Novartis does not even track the number of women who receive

promotions, nor does it compare the rate of female promotion to that of men. Id. at 466-67.

**E.    Novartis Discriminates Against Women on the Basis of Pregnancy.**

Compelling evidence establishes that Novartis demonstrates hostility towards pregnant

employees and discriminates against women on the basis of their Family Medical Leave Act

("FMLA") status.   For example, when Declarant Brenda Scott of Texas announced her pregnancy, District Manager Eduardo DeLugo sarcastically stated, "You're having another baby? You're kidding, right?"   Scott Dec. ¶ 6 (Ex. 28).   Additionally, when District Manager Brad Willie overheard Declarant Amy Zschiesche of Iowa tell a coworker that she was thinking about having a third child, Mr. Willie told Ms. Zschiesche that she should take care of the children she already had and that he did not want any more vacancies in his territory.   See Zschiesche Dec. ¶ 6 (Ex. 27).   When Plaintiff Holly Waters of Maryland was suffering from morning sickness, her male manager insisted that she notify him of any lateness by telephone rather than email, stating, "I don't care if you're puking your guts out." Waters Dep. 79 (Ex. 22).

The Company's culture of animosity towards employees who are pregnant translates into fewer promotions, less pay, and undeserved disciplinary actions for Novartis women across the country.   For example:

- Plaintiff Velez of Maryland heard her male manager ask recruiters whether candidates were single, married, or had children on three separate occasions.   See Velez Dep. (Day 1) 283-84.   When Ms. Velez returned from her own maternity leave, Manager Cunneen twice told her that she "was under the gun."   Id. at 290-91.

- Plaintiff Williams's male manager in Illinois told her that she "might want to reconsider her future plans for management now that [she is] a mother." Williams Dep. 163.

- Declarant Amy Noonan's male manager in New Jersey removed her from the Organizational Talent Review list and demoted her when she returned from maternity leave, advising her that she was "a mom now" and would not be promoted because she had been "on vacation for six months." Noonan Dec. ¶ 10-11.

Twenty-eight declarations from women who attest to receiving less pay, fewer promotions, and more disciplinary actions after becoming pregnant, further evidence Novartis' pattern and practice of punishing employees for pregnancy.   See generally Chart of Declarations and Exhibits 27-33.

21

Statistical evidence also establishes that women who take FMLA leave earn less money than those who do not. See Lanier Report p. 24. Seventy-five percent of women hired to sales positions at Novartis during the class period were younger than 36 years old, thus increasing the likelihood that female employees will become pregnant during their tenure at Novartis and have need to avail themselves of FMLA leave. See Lanier Dec. ¶ 4. In fact, female employees are 76 times more likely than their male counterparts to take FMLA leave. Id. As such, the negative compensatory effect of taking FMLA leave disproportionately affects women. Id.

F.    **Statistical Measures Demonstrate the Pay, Promotion and Pregnancy Discrimination at Novartis.**

1.    **Statistical Evidence Shows Promotion Discrimination at Novartis.**

A statistical analysis of the Company's workforce reflects a pyramid-like structure in which women are relegated to low-level jobs and men hold the top positions. For instance, women make up 52.1 percent of Sales Representatives, 52.6 percent of Sales Consultants, and 50.4 percent of Senior Sales Consultants. See Lanier Report, pp. 14-15. By contrast, only 24.2 percent of women are Executive Sales Consultants. Id. The same pattern exists in the specialty market sales arena, where women hold 56.3 percent of the entry level Sales Representative positions and 43 percent of associate and specialist positions. Id. The percentage of women who hold the more desirable Senior Specialist position, however, is merely 28.5 percent. Id.

While female employees are overrepresented at the lower level of Novartis positions, they are significantly underrepresented at the managerial level. Dr. Lanier analyzed the probability of promotion to management for sales employees in the promotion pool throughout 2002 to 2005. See Lanier Dec. ¶ 15. After controlling for tenure and experience, Dr. Lanier concluded that the male predicted probability of promotion is 4.9 times higher than the female

predicted probability throughout 2002-2005, which is statistically significant to 5.7 standard deviations. Id.[3]

Males at Novartis received 2.2 times more promotions to management than women during the period 2002-2004, which is statistically significant to 4.1 standard deviations. See Lanier Report pp. 18.

Female employees are less likely to gain entry to the Management Development Program as well. The ratio of male to female selection into MDP is 70 percent higher than would be expected under a gender neutral MDP process. See Lanier Report pp. 20-21. This result is statistically significant to 6.0 standard deviations. Id. Because the MDP process is mandatory for all internal managerial candidates, the demonstrated bias against female admittance into MDP necessarily impedes women seeking promotions to management. Not surprisingly then, women constitute a mere 24.3 percent of the first level district managers. Id. at 14.

### 2. Statistical Evidence Demonstrates Discrimination in Pay at Novartis.

Female Novartis employees earn less money than their similarly-situated male counterparts. See Lanier Dec. ¶ 9-12. This pay disparity extends both within and across job titles. Id. In other words, in most positions at Novartis, men make more than females who hold the exact same job (the "within job" component.) See Lanier Report pp. 12-17; Lanier Dec. ¶ 9. Men also earn more money "across jobs." See Lanier Dec. ¶ 9-12; Lanier Report pp. 13-14.

Controlling for age (a proxy for total labor force experience) and tenure, Dr. Lanier concluded that males made more than their similarly-situated female counterparts *in nearly every job group* (92 percent of the job titles) from 2002-2005. See Lanier Report pp. 12-17; Lanier Dec. ¶ 9. On average, men earned $897.84 more per year than their female counterparts who

---

[3] Five standard deviations suggests a probability of one in 400,000 that the result occurred by natural chance, and six standard deviations suggests a probability of about one in 31 million that the result occurred by natural chance. See Lanier Dep. 151-53 (Ex. 39).

held the same job for every year from 2002-2005. Id. This difference is statistically significant to 5.4 standard deviations. Id. This discriminatory pay structure was even more stark in certain positions, such as the district manager, where males earned an average of $3,438.84 more than their similarly-situated counterparts per year for every year from 2002-2005. See Lanier Report p. 13.

Men earn more "across jobs" as well. An analysis that discounts the difference in pay between men and women within job titles shows that men earn on average $1,678.32 more money than women across all job titles in the entire sales force. See Lanier Dec. ¶ 9-13.[4]

### 3.    Statistical Evidence Demonstrates Pregnancy Discrimination.

Statistical evidence obtained by Plaintiffs confirms that there is pregnancy discrimination throughout all levels of Novartis. Statistical expert Dr. Lanier analyzed the pay of women who took pregnancy leave, controlling for tenure, experience, job titles, systemic differences between females who took leave versus those who did not, and systemic, company-wide changes in earnings that could have occurred from month to month. See Lanier Report pp. 23-24. Dr. Lanier found that women who take FMLA leave earn an average of $210.20 less per month for the first six months after returning, relative to those who do not take leave, which is statistically significant to 6.4 standard deviations. Id. Additionally, women who take leave earn an average of $147 less per month in the first 12 months after returning, relative to similarly situated female counterparts and to their earnings before taking leave. Id. This pregnancy penalty is statistically significant to 5.2 standard deviations. Id. at 24.

---

[4] Dr. Lanier arrived at this total by subtracting the total earning disparity across all jobs by the total disparity within jobs (noted above as $897.84.) Id. The total earning disparity across jobs measures the total difference in pay between men and women at Novartis, which is partially caused by men holding higher paying jobs. Id.; Lanier Report pp. 13-14. Dr. Lanier calculated that this total earning disparity across jobs between men and women was $2,576.16. Id. at 11. By subtracting the total monthly gender disparity ($2,576,16) from the within job monthly gender disparity ($897.84), Dr. Lanier concluded that there is an across-job disparity of $1,678.32. See Lanier Dec. ¶ 9-13.